UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
In re SKECHERS USA, INC.
SECURITIES LITIGATION

                         **MEMORANDUM AND ORDER**

This Document Relates to:

                          18 Civ. 8039 (NRB)

    ALL ACTIONS.
--------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Local #817 IBT Pension Fund, Local 272 Labor-Management Pension Fund, and Chester County Employees Retirement Fund ("Pension Fund Plaintiffs") bring this federal securities fraud class action on behalf of all individuals and entities that purchased the common stock of Skechers USA, Inc. ("Skechers" or the "Company") between October 20, 2017 and July 19, 2018, inclusive (the "Class Period"). Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against Skechers, its chief executive officer (the "CEO") Robert Greenberg, its chief operating officer (the "COO") David Weinberg, and its chief financial officer (the "CFO") John Vandemore (collectively, the "Individual Defendants"). Before the Court is defendants' motion to dismiss the consolidated amended class action complaint ("CAC") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, defendants' motion is granted.

## I.  Background

### A.  Skechers

Skechers is a global footwear designer and marketer that uses its distribution networks, joint ventures, and wholly-owned subsidiaries to sell Skechers-branded shoes in over 170 countries. CAC (ECF No. 32) ¶¶ 2, 34.  The Company operates through three reportable segments: (1) domestic wholesale, (2) international wholesale, and (3) retail sales.  Id. at ¶ 38.  In 2017, the international wholesale segment was the Company's biggest distribution channel, generating 41.5% of its total sales.  Id. at ¶ 44.

Skechers expanded in recent years.  Id. at ¶ 3.  Between 2012 and 2017, its total annual net sales grew by 166%, and its international wholesale segment grew by 300%.  Id. at ¶¶ 41, 43. In particular, the Company's growth in China had been pronounced. Id. at ¶ 45.  Skechers operates in China through a joint venture named Skechers China Limited, which was formed in October 2007. Id. at ¶ 45.  The growth in the Company's sales was also attributable to the expansion of its mono-branded retail store and direct-to-consumer e-commerce businesses.  Id. at ¶ 51.  Between 2012 and 2017, Skechers' retail sales, including both its retail store and e-commerce operations, grew by 148%.  Id.

Contemporaneously with such dramatic growth in sales, Skechers faced substantial increase in its Selling, General and

Administrative ("SG&A") expenses.[1]  Id. at ¶ 53.  During the same period—between 2012 and 2017—its SG&A expenses grew by 135%.  Id. at ¶ 64.  One of the factors that fueled the Company's SG&A expenses was Skechers' operations in China.  Id. at ¶ 58.  Because Skechers did not have its own distribution center in China, it had to rely on third-party operational solutions for serving its stores and shipping its products to online customers.  Id. at ¶ 59.[2] Under this operational structure, Skechers incurred additional costs on a per unit basis.  Id.  Another factor that contributed to the SG&A expense increase was Skechers' expansion of its retail store operations in China.  Id. at ¶ 60.  As a general matter, opening a new store is planned at least six to nine months prior to the store's actual opening because lead time is necessary to secure a physical location, staff and inventory, among other things.  Id.

B.  **Individual Defendants**

Defendant Greenberg has served as Skechers' CEO and Chairman of the Board since the founding of the Company in 1992.  CAC ¶ 24.

---

[1]    "SG&A expense" is an accounting term that appears in a company's income statement.  Generally, SG&A expenses of a company include most of the expenses that are not related to the manufacturing of its products (or services).  Examples of SG&A expenses that are relevant to this action include expenses incurred in connection with shipping products to customers, advertising, and renting real estate for operating warehouses and stores.

[2]    Plaintiffs allege that Skechers relied on "costly third party operations in international markets" to establish the falsity of the challenged statements.  See, e.g., CAC ¶ 113(b).  However, in the CAC, plaintiffs allege facts detailing such operations only with respect to China.  Accordingly, the Court regards the "third party operations" allegations to concern only China.

Defendant Weinberg has served as the Company's COO, Executive Vice President, and a member of the Company's Board. Id. at ¶ 25. Until about November 15, 2017, Weinberg also served as the Company's CFO. Id. Defendant Vandemore has served as the Company's CFO since November 15, 2017. Id. at ¶ 26.

C. **Alleged Misstatements**

1. Earnings Call for 2017 Q3

Plaintiffs allege that Weinberg made three materially false and misleading statements during Skechers' October 19, 2017 Earnings Call for the third quarter of 2017.

First, in response to a Citigroup analyst's question of whether there had been any changes to Weinberg's previous expectation that SG&A growth should start to slow in the first quarter of 2018, Weinberg stated, "All I said was it will certainly continue into the first quarter." Id. at ¶ 112.[3]

Second, in response to a Morgan Stanley director's question about the Company's projections of SG&A and G&A expenses[4] for 2018 in dollar terms, Weinberg stated, "I would tell you the

_____

[3]     It appears that there are no "official" transcripts for earnings calls. At oral argument, the Court asked about each party's source of the earnings call transcript. Plaintiffs answered Thomson Reuter, and defendants answered Standard & Poor's. Oral Arg. Tr. (ECF No. 57) at 2. After oral argument, the Court asked the parties to submit their respective transcripts of the earnings calls relevant to this case. Any discrepancy between the two versions is immaterial in resolving this motion.
[4]     "G&A expenses" refers to the portion of SG&A expenses excluding Sales expenses, which include expenses related to selling a company's products or services such as advertising expenses, shipping costs and commissions for sales representatives. Generally, "G&A expenses" include expenses associated with managing and operating a company as a business organization.

anticipation here is that the rate of growth, certainly in the G&A piece, will come down from this year as we end the year. There are no new pieces to pick up." Id. at ¶ 114.

Lastly, in response to a Wedbush Securities analyst's question about the likelihood of Skechers leveraging[5] its G&A expenses in 2018, Weinberg stated, "I'm not a person that would tend to say never, but I think your last characterization of – for the most part, that most of the scenarios are positive leverage, I think that's correct." Id. at ¶ 116.

### 2. Earnings Call for 2017 Q4 and Fiscal Year 2017

Plaintiffs allege that two of the Individual Defendants' statements during the Skechers Earnings Call for 2017 Q4 and fiscal year 2017, which was held on February 8, 2018, were materially false and misleading.

First, in response to a Citigroup analyst's question about advertising expenses as a percentage of sales for the fiscal year 2017 and going forward, defendant Weinberg stated that "we anticipate that the rate of growth will continue to slow as it has in the past, and we'll be able to leverage them." Id. at ¶ 125.

_____

[5] "Leverage" is a financial term that generally refers to the ratio of a company's liabilities to its equity. However, throughout Skechers' earnings calls mentioned in the CAC and in this action, all relevant parties appeared to use the term "leverage" to refer to the relationship between the growth rate of Skechers' sales and the growth rate of its expenses, with "positive leverage" meaning the Company's sales growing at a higher rate than its expenses. Therefore, in this Memorandum and Order, we use the term "leverage" in the same manner in which it was used on the earnings calls.

Second, in response to a Cowen and Company analyst's question about defendant Vendemore's expectations on the gross margin and SG&A expenses in 2018 Q1, Vendemore stated, "And then from an SG&A perspective, we think it will begin to show the leverage that we've experienced in Q4." Id. at ¶ 127.

### 3. Earnings Call for 2018 Q1

Plaintiffs allege that two of defendant Weinberg's statements during the Skechers Earnings Call for 2018 Q1, which was held on April 19, 2018, were materially false and misleading.

First, in response to a B. Riley FBR analyst's question of whether leverage on the SG&A expenses would start again in 2018 Q3, Weinberg stated, "So we do believe that we will catch up, that the top line will be such and that we will be able to again start to leverage again in Q3. It should be a very positive time for us." Id. at ¶ 139.

Second, in response to a Susquehanna Financial Group analyst's question about what led to a divergence between the guidance on SG&A expenses that Skechers management provided at the time it announced the Company's results for 2017 Q4 and the actual G&A expense results for 2018 Q1, Weinberg stated, "Well, it was a later event. As [Vendemore] said, it has to do with the distribution cost. And, by far, March was a much bigger month and a much bigger by average, which is why we were higher than our original guidance as far as business concerned." Id. at ¶ 137.

4.   SEC Filings

Plaintiffs allege that the following statements in Skechers' SEC filings during the Class Period were materially false and misleading:

- During the remainder of 2017, we intend to focus on: . . . (ii) continuing to manage our inventory and expenses to be in line with expected sales levels. (Skechers 10-Q for 2017 3Q, dated November 3, 2017)

- During 2017, we continued to focus on managing our balance sheet and bringing our marketing expenses and general and administrative expenses in line with expected sales. (Skechers 10-K for the fiscal year 2017, dated March 1, 2018)

- During the remainder of 2018, we intend to focus on: . . . (ii) continuing to manage our inventory and expenses to be in line with expected sales levels. (Skechers 10-Q for 2018 Q1, dated May 4, 2018)

Id. at ¶¶ 119, 130, 142.

D.   **Alleged Omission**

Plaintiffs allege that defendants were required to disclose Skechers' future expenses in order to prevent the statements described above from being misleading.  Pls.' Opp'n (ECF No. 49) at 12-13.  Plaintiffs further allege that defendants violated the disclosure obligation imposed by Item 303 of SEC Regulation S-K ("Item 303"), codified at 17 C.F.R. § 229.303, which "imposes disclosure requirements on companies filing SEC-mandated reports," including Form 10-Q and 10-K reports.  Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015).  Those requirements include an obligation to:

> Describe any known trends or uncertainties that have
> had or that the registrant reasonably expects will
> have a material favorable or unfavorable impact on
> net sales or revenues or income from continuing
> operations. If the registrant knows of events that
> will cause a material change in the relationship
> between costs and revenues (such as known future
> increases in costs of labor or materials or price
> increases or inventory adjustments), the change in
> the relationship shall be disclosed.

17 C.F.R. 229.303(a)(3)(ii).  According to plaintiffs, Skechers violated Item 303 by failing to disclose the SG&A expense growth and the trajectory of it that was known to them at the time.  CAC ¶¶ 150-55.

E.  **Alleged Corrective Disclosures**

Plaintiffs allege that there were two separate disclosures by defendants that revealed the falsity of challenged statements.

1.  Alleged First Corrective Disclosure

Following the close of market on April 19, 2018, Skechers announced its financial results for 2018 Q1.  Id. at ¶ 87. Although Skechers reported record-high sales of $1.25 billion, it failed to achieve leverage: compared to 2017 Q1, the SG&A expenses grew 23.4% whereas the sales grew 16.5%.  Id. at ¶¶ 87-88. According to plaintiffs, the discrepancy between the financial results for 2018 Q1 and the challenged statements by Skechers management on the prospect of achieving leverage constituted a corrective disclosure by itself.

2.  <u>Alleged Second Corrective Disclosure</u>

Following the close of market on July 19, 2018, Skechers announced its financial results for 2018 Q2. <u>Id.</u> at ¶ 98. Skechers again failed to achieve leverage: compared to 2017 Q2, the sales grew only 10.6% whereas the SG&A expenses grew 19.7%. <u>Id.</u> at ¶ 98. Following this announcement of results, on the same day, Skechers management hosted an earnings call to discuss the Company's performance during 2018 Q2. <u>Id.</u> at ¶ 101. During the earnings call, in response to a Cowen and Company analyst's question on how an effort to achieve greater profitability would affect the Company's sales growth, Weinberg stated:

> We just don't necessarily think that way. We're into growth. We think that transition to sacrificing top line growth for EBIT will happen when a marketplace tell us — as we get into — closer to a saturation point. Right now, we are built for growth. We have the capital for growth. We wouldn't leave anything on the table . . . .

<u>Id.</u> at ¶ 102. According to plaintiffs, through this statement, defendant Weinberg "made it abundantly clear that, in contrast to their prior statements, [d]efendants were not in any way concerned with increasing the Company's profits, or managing its expenses, and were solely focused on top line growth." <u>Id.</u>

F.  **Procedural History**

On September 4, 2018, Laborers Local 235 Benefit Funds commenced this action by filing a class action complaint against defendants. <u>See</u> ECF No. 1. On October 17, 2018, plaintiff Steven

S. Fishman filed a separate class action complaint, alleging essentially the same claims against defendants. <u>See</u> 18 Civ. 9510, ECF No. 1.

On November 5, 2018, three separate groups of plaintiffs moved to consolidate the two actions, appoint themselves as the lead plaintiff, and appoint their respective counsel as the lead counsel in the consolidated action. <u>See</u> ECF Nos. 8; 11. On November 20, 2018, the Court granted the Pension Fund Plaintiffs' motion, appointed the Pension Fund Plaintiffs as the lead plaintiffs, and approved the lead plaintiffs' selection of Robbins Geller Rudman & Dowd LLP as the lead counsel in the consolidated action. <u>See</u> ECF No. 21.

Pursuant to the schedule consented to by the parties and endorsed by the Court, <u>see</u> ECF No. 27, plaintiffs filed the consolidated amended class action complaint on January 22, 2019. <u>See</u> ECF No. 32. After reviewing the parties' pre-motion letters of March 25, 2019 and April 8, 2019, the Court granted defendants leave to make their proposed motion to dismiss the CAC. <u>See</u> ECF No. 39. On May 13, 2019, defendants moved to dismiss the CAC in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). <u>See</u> ECF No. 45. The Court heard oral argument on this motion on January 23, 2020. <u>See</u> ECF No. 57.

## II.  **Discussion**

A.  **Legal Standards**

   1.   Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor.  City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014).  "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Thus, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face."  Id.  If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  Id.

   2.   Heightened Pleading Standard for Claims under
        Section 10(b) of the Exchange Act and Rule 10b-5

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, plaintiffs must also satisfy the heightened pleading requirements under the Federal Rule of

Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). <u>ATSI Comm., Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007); 15 U.S.C. § 78u-4(b). Rule 9(b) requires plaintiffs asserting securities fraud claims to "(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004).

"The PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Anschutz Corp. v. Merrill Lynch & Co.</u>, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks and alterations omitted). The PSLRA further provides that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

> 3. <u>Requirements for Stating a Claim under Section 10(b) of the Exchange Act and Rule 10b-5</u>

For claims of securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs must allege that defendants

"(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 463 (2d Cir. 2019).

a) **Misstatement or Omission of Material Fact**

For a statement to be actionable under Section 10(b) of the Exchange Act and Rule 10b-5, it must be both (1) false, and (2) material. In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). A statement is false for the purpose of Section 10(b) and Rule 10b-5 if it was false "at the time it was made." Id. To state a claim, "plaintiffs must do more than say that the statements [at issue] were false and misleading; they must demonstrate with specificity why and how that is so." Rombach, 355 F.3d at 174. "Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." In re IBM Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (internal quotation marks and citations omitted).

An omission is also actionable under Section 10(b) and Rule 10b-5, but only when the defendants had a duty to disclose the allegedly omitted information. Levitt v. J.P. Morgan Sec., Inc.,

710 F.3d 454, 465 (2d Cir. 2013). Such duty to disclose "may arise when there is a corporate insider trading on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Stratte-McClure, 776 F.3d at 101.

To be actionable under Section 10(b) and Rule 10b-5, the alleged misstatement or omission must also be material. This requirement is satisfied if "there is a substantial likelihood that a reasonable person would consider [the allegedly misstated or omitted fact] important in deciding whether to buy or sell" the securities at issue. Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994). "When contingent or speculative future events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001).

b) **Scienter**

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegations, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). "[T]he inference of scienter must

14

be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Id. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Plaintiffs can satisfy this standard (1) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," or (2) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). "Motive . . . could be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98, 108 (2d Cir. 2009). As to the circumstantial evidence prong, the Second Circuit has observed:

> at least four circumstances that may give rise to a strong
> inference of the requisite scienter: where the complaint
> sufficiently alleges that the defendants (1) benefited in a
> concrete and personal way from the purported fraud; (2)
> engaged in deliberately illegal behavior; (3) knew facts or
> had access to information suggesting that their public
> statements were not accurate; or (4) failed to check
> information they had a duty to monitor.

ECA, 553 F.3d at 198-99.

c) **Loss Causation**

To plead loss causation, plaintiffs must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Suez Equity Inv., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001). Plaintiffs may adequately plead loss causation by alleging either (1) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud," or (2) "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014).

4. PSLRA Safe Harbor

The PSLRA established a statutory safe harbor for forward-looking statements. Under the safe harbor, a defendant "shall not be liable with respect to any forward-looking statement," which, in relevant part, is defined as a statement:

> Identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

15 U.S.C. §78u-5(c)(1)(A)(i). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not

16

boilerplate and conveyed substantive information." Slayton v. Am. Exp. Co., 604 F.3d 758, 772 (2d Cir. 2010). "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials — including the cautionary language — to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" In re Delcath Sys., Inc. Sec. Litig., 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting Halperin v. eBanker USA.com,Inc., 295 F.3d 352, 359 (2d Cir. 2002)). "Cautionary language that did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss is insufficient." Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018).

B.  **Analysis**

1.  Overview of the Case

At the outset, we provide a big picture overview of plaintiffs' case and defendants' position in response to it. At the center of the parties' dispute are a number of statements about "leverage" that Skechers' management made during earnings calls and in the Company's SEC filings. In essence, plaintiffs contend that Skechers management was not honest in suggesting that the Company would likely achieve leverage in the near future. According to plaintiffs, such optimism was problematic because the

17

management was aware of, but suppressed, the fact that the Company would not be able to achieve any leverage given the expenses already committed to the planned expansions. Defendants maintain that there is no basis to infer that management suppressed any information and that plaintiffs are distorting the meaning of challenged statements by isolating them from their full context. We now proceed to address the specific arguments raised by the parties.

### 2. Applicability of PSLRA Safe Harbor

The Court first addresses whether the challenged statements are protected under the PSLRA's safe harbor for forward-looking statements. As discussed above, to invoke the safe harbor protection under the PSLRA, the statements at issue must be accompanied by meaningful cautionary language that is "not boilerplate and convey[s] substantive information." Slayton, 604 F.3d at 772. Defendants contend that eight of the ten statements at issue satisfy this requirement. The cautionary statements defendants refer to in support of this contention are the two statements in Skechers' 10-K for the fiscal year ending December 31, 2016: (1) "our expenses may be disproportionately large relative to our revenues, and we may be unable to adjust spending in a timely manner to compensate for any unexpected revenue shifts, which could have a material adverse effect on our operating results," and (2) that Skechers faced uncertainty from global

market conditions, including "controlling . . . expenses." Defs.'
Mem. of Law (ECF No. 46) at 9-10.

Even assuming _arguendo_ that statements in a company's
regulatory filings could serve as the basis for triggering the
PSLRA safe harbor protection by the virtue of being referenced at
the beginning of an earnings call, the statements in Skechers' 10-
K cited by defendants do not provide sufficiently meaningful
information about the specific risks addressed by the alleged
misstatements to invoke the safe harbor under the PSLRA.
Plaintiffs claim that eight of the ten challenged statements
pertained to Skechers' expansion of retail stores and reliance on
expensive third-party operators to distribute its products in
China, which allegedly precluded Skechers from achieving leverage.
CAC ¶¶ 59-60. The cautionary statements cited by defendants
essentially provide that the Company's sales may fluctuate due to
various uncertainties and therefore the relationship between its
sales and expenses—i.e., leverage—may fluctuate as well. See
Rudzin Decl. (ECF No. 47), Ex. V at 17-18. Although these
statements address the central subject of the parties' dispute
here, they do not address the specific risk that plaintiffs cite
in this action, namely, the Company's operational structure in
China. Moreover, the cautionary statements cited by defendants
discuss the risks associated with the Company's sales only in
general terms that do not provide sufficiently meaningful

information about the effect of fluctuations in sales on leverage given the Company's operational structure. Under the circumstances, the cautionary statements cited by defendants are insufficient to invoke the safe harbor protection under the PSLRA. See In re Salix Pharmaceuticals, Ltd., 14 Civ. 8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing.").

### 3. Alleged Misstatements of Material Facts

Defendants argue that plaintiffs have failed to allege facts sufficient to establish the falsity of the alleged misstatements. Defendants also argue that the alleged misstatements, with the exception of defendant Weinberg's statement during the 2018 Q1 earnings call regarding the divergence between the Company's previous guidance on SG&A expenses for 2018 Q1 and the actual outcome ("2018 Q1 SG&A Explanation Statement"), are not actionable under Section 10(b) and Rule 10b-5 because they are either predictions without any guarantee or mere puffery.

#### a) **Earnings Call Statements**

An examination of the statements made during the management earnings calls provides ample support for defendants' position that they are non-actionable predictions. Specifically, in

response to analysts' questions during the 2017 Q3 earnings call, Weinberg stated,

- "I would tell you the <u>anticipation</u> here is that the rate of growth certainly in the G&A piece will come down from this year, as we end the year there are no new pieces to pick up," CAC ¶ 114, and

- "But I think your last characterization of — for the most part, yeah, <u>most of the scenarios</u> are positive leverage, I think that's correct." <u>Id.</u> at ¶ 116.

Similar are defendants Weinberg and Vendemore' statements that were made in response to analysts' questions during the 2017 Q4 and 2018 Q1 earnings calls:

- "we <u>anticipate</u> that the rate of growth will continue to slow as it has in the past, and we'll be able to leverage them," <u>id.</u> at ¶ 125,

- "And then from an SG&A perspective, we <u>think it will</u> begin to show the leverage that we've experienced in Q4," <u>id.</u> at ¶ 127, and

- "So we <u>do believe that we will</u> catch up, that the top line will be such and that we will be able to again start to leverage again in Q3. It should be a very positive time for us." <u>Id.</u> at ¶ 139.

The common theme of these statements is that the management was expecting the Company to achieve leverage in the future. These statements provide the management's predictions and opinions about the SG&A expenses and the prospect of achieving leverage in the coming quarters, but do not promise or guarantee the investors to achieve any specific level of leverage by any specific point of time.

Although Weinberg's statement during the 2017 Q3 earnings call—"Yeah, all right, so they will certainly continue into the first quarter. I think that's where the big possibilities are," id. at ¶ 112—when considered in isolation, may appear to provide something more than the management's prediction due to the word "certainly," this statement falls far short of providing any guarantee to investors when it is put in context. Weinberg's statement at issue was made during the following exchange:

> **Corinna Gayle Van der Ghinst** (Vice President & Small-Cap and Mid-Cap Analyst at Citigroup, Inc.): Okay. And then, could you provide us with your updated SG&A expectations for the fourth quarter? Are there any changes to your previous expectation that SG&A growth should start to slow down starting in Q1 of next year?

> **Weinberg** (CFO, COO, Executive Vice President & Director at Skechers): Yes. I actually think it starts to slow down a little bit in Q4 because we will — the biggest impact to that would have been Korea and that will start to lap it in the fourth quarter so — to that degree. So I would anticipate, on a year-over-year basis, we've actually slowed down the growth a little bit of the expenses.

**Corinna Gayle Van der Ghinst**: Okay. Great. And then, my follow-up — sorry.

**Weinberg**: Yes. All I said was it will certainly continue into the first quarter. I think that's where the big possibilities are.

Id. at ¶ 112. As obvious from the exchange above, Weinberg provided the statement at issue in response to a Citigroup analyst's question: "Are there any changes to your previous expectation that SG&A growth should start to slow down starting in Q1 of next year?" CAC ¶ 112. Moreover, Weinberg made the statement at issue as a summary of his answer, which provides no more than his opinion and anticipation about the trend of SG&A expenses going forward. Id. In short, despite the word "certainly," an investor could not have reasonably interpreted Weinberg's statement at issue as a guarantee rather than a prediction unless one chose to disregard the context in which the statement was made. The key question in considering the misleading nature of a statement is "whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor," McMahan & Co. v. Wherehouse Ent., Inc., 900 F.2d 576, 579 (2d Cir. 1990), not whether it is susceptible to any interpretation that could generate misleading impressions when read in isolation.

### b) **2018 Q1 SG&A Explanation Statement**

During the earnings call for 2018 Q1, a Susquehanna Financial Group analyst presented the following question to the Company's management:

> [A]bout six weeks ago or whenever you announced or eight weeks ago announced Q4, you guided the SG&A to a certain level and the G&A came in well higher. And I guess, the question is, was — how much of the incremental spend was last-minute to support, like, sort of, when did you know, when did this arise, the need to—for this additional spend?

CAC ¶ 137. In response, Weinberg stated:

> Well it was a later event. As [Vendemore] said, it has to do with the distribution costs and by far March was a much bigger month and a much bigger by average which is why we were higher than our initial guidance as far as business was concerned, both in the U.S. and Europe and in China, which had a bigger piece coming through their franchises and their online businesses.

Id. Plaintiffs contend that this 2018 Q1 SG&A Explanation Statement was materially false and misleading because the increase in SG&A expenses could not be a "later event" given that Skechers had forecasted its sales—and accordingly the corresponding expenses—well ahead and had previously boasted about its relationship with its logistics partners to carefully monitor and forecast inventory needs. Id. at ¶ 138.

The Court disagrees. It is noteworthy that this statement by Weinberg was made in response to an analyst's question about "how much of the incremental spend was last-minute," id. at ¶ 137, and his statement was an after-the-fact explanation about the G&A

24

expenses for 2018 Q1.[6]  Accordingly, the accuracy of this statement

depends on whether the divergence between the Company's previous

guidance on expenses for 2018 Q1 and the actual result was indeed

caused by a "later event," not whether defendants could have

anticipated such increase in advance.  However, the CAC is devoid

of any allegation, and plaintiffs do not raise any argument in

their motion papers, about the underlying causes of the divergence

at issue.  Therefore, plaintiffs have failed to adequately plead

a claim predicated on the 2018 Q1 SG&A Explanation Statement.

### c) **Statements in SEC Filings**

As mentioned above, defendants contend that the challenged

statements in Skechers' SEC filings are non-actionable puffery.

Statements are "puffery" if they "are too general to cause a

reasonable investor to rely upon them." <u>ECA, Local 134 IBEW Joint</u>

<u>Pension Tr. of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 206

(2d Cir. 2009).  The Court agrees with defendants that the

challenged statements in the Company's 10-Qs for 2017 Q3 and 2018

Q1 are non-actionable puffery.  They simply state that, during the

remainder of the respective year, management "intend[s] to focus

on . . . (ii) continuing to manage [the Company's] . . . expenses

---

[6]     The Court further notes an internal inconsistency within the
question presented by the Susquehanna International Group analyst, which asked
to reconcile the discrepancy between the Company's previous guidance on SG&A
expenses and the G&A expenses result for 2018 Q1.  Given the internal
inconsistency in the question presented, it is questionable whether Weinberg's
answer to it could be regarded as delivering any meaningful information that
could render it an actionable misstatement.

to be in line with expected sales levels." CAC ¶¶ 119, 142.  These
statements suggest that the ratio between expenses and sales is
one of management's macroscale objectives in operating the
Company.  However, the statements do not suggest that management
had any set target ratio.  Although the frequency of securities
analysts asking about the Company's predictions on various
components of its expenses and leverage suggests that the market
was interested in the Company's expenses and leverage, these
statements are too general to generate any concrete form of
expectation that management would run the Company in a certain
manner or achieve any specific outcome.[7]

The challenged statement in the Company's 10-K for the fiscal
year 2017 is slightly different in that it is stated in past tense
as a summary of the management's objectives during the past year:
"During 2017, we continued to focus on managing our balance sheet
and bringing our marketing expenses and general and administrative
expenses in line with expected sales."  Id. at ¶ 130.  Plaintiffs
rely on two arguments to support their position of falsity: first,
that defendants were "solely focused on growing Skechers' topline
. . . without any regard to the SG&A expenses that were necessary

---

[7]     Given that the challenged statements in Skechers' 10-Qs simply
recite a fundamental business principle that managing expenses in line with
sales is necessary for realizing any profit, to even suggest those statements
as actionable misstatements is somewhat sketchy.  In the absence of well-pled
scienter, which for the reasons infra has not been accomplished, reliance on
these statements is a non-starter for pleading securities fraud.

to achieve an increase in sales numbers," and second that, given the Company's reliance on third-party operations and already-planned expansion of retail operations in China, management should have expected that the expenses would grow at a higher rate than the sales. Id. at ¶ 131. As to the first argument, the only allegation about Skechers' management's focus on sales figure in the CAC is the "[w]e're into growth" statement by defendant Weinberg during the earnings call for 2018 Q2: the alleged second corrective disclosure. Id. at ¶ 102. The "[w]e're into growth" statement, however, was made on July 19, 2018 whereas Skechers' 10-K for the fiscal year 2017, which contained the alleged misstatement, was filed on March 1, 2018. CAC ¶¶ 98, 102, 129. Nothing in the CAC provides a basis to relate Weinberg's "[w]e're into growth" statement back to 2017. Therefore, plaintiffs have failed to allege any fact showing the falsity of challenged statement in Skechers' 10-K for 2017 at the time it was made.

Further, it is far from clear whether the alleged second corrective disclosure—the "[w]e're into growth" statement by Weinberg—even supports plaintiffs' contention that Skechers' management exclusively focused on sales when considered in context. The alleged second corrective disclosure, as alleged in the CAC, appears to be a product of selective—and somewhat dubious—quotation of Weinberg's answer to an analyst's question. The

27

"[w]e're into growth" statement was made during the following exchange:

> **John David Kernan** (Managing Director and Senior Research Analyst at Cowen and Company LLC): All right. So I guess, my final question is a bigger picture question. There has been well over $1 billion in total top line growth. The past couple of years just there has not been much growth in EBIT. So I'm just wondering at what point do you think you will trade top line growth with ability to start growing top line in a more significant rate? Do you think — if you pull back on G&A expenses, do you think the top line would decelerate significantly in line with that?

> **Weinberg**: We just don't necessarily think that way. We're into growth. We think that transition to sacrificing top line growth for EBIT will happen when a marketplace tell us — as we get into — closer to a saturation point. Right now, we are built for growth. We have the capital for growth. We wouldn't leave anything on the table. And we still, like we said, have significant areas where we're underpenetrated such as South America, such as Japan, such as India, which is starting to grow very nicely and will contribute to EBITDA by the back half of this year. So there's a lot of positive things happen. I think we will have better results from it if you look at an EBITDA basis as we get through the end of the year and into next year because a lot of the heavy lifting will be done. We still have something to do with the distribution center in China, which will be a benefit — which will benefit the EBITDA line in China and make them more efficient. So we still got some ways to go, but we do think, as we get through the end of this year into next year, we should start to leverage unless there is some outgrowth averages growth in a couple of big territories that we have to invest in.

Rudzin Decl. (ECF No. 47), Ex. Y at 12 (highlighted part indicating the portion of Weinberg's answer that was omitted in the CAC).[8] Weinberg's answer, if considered in its entirety, does not suggest that Skechers' management was interested only in sales without any regard for the Company's profit.  Instead, Weinberg's answer provides a broad overview of the Company's strategy for achieving leverage and thereby increasing profitability.  The phrase "[w]e're into growth" was used simply as a means to indicate which phase in that strategy the Company was then passing through.

The second proffered contention—that, given the Company's reliance on third-party operations and already-planned expansion of retail operations in China, management should have expected that the expenses would grow at a higher rate than the sales—is simply inapposite.  This contention pertains only to the management's expectations on expenses and does not even tangentially touch on the issue of whether management actually "focus[ed] on managing [the Company's] balance sheet and bringing [its] marketing expenses and general and administrative expenses in line with expected sales."  Id. at ¶ 130.  That management should have anticipated large expenses has no implication on what it actually did to balance the expenses  in line with expected sales.

---

[8]    The quoted statement by Weinberg is identical in both parties' versions of the July 19, 2018 earnings call transcript.

Further, to show the falsity of this statement, information about expected sales is required because the statement at issue does not address management of expenses generally but management of expenses only "in line with expected sales." Id. However, the CAC is devoid of any allegation about the Company's contemporaneous projection of sales. Therefore, plaintiff's endeavor amounts to no more than an untethered argument. Since this defect in plaintiffs' pleading applies equally to other challenged statements, we further address this issue in the following section.

d) **Absence of Allegations about Sales**

The only facts alleged by plaintiffs as establishing the falsity of the challenged statements, including the one in 2017 10-K that we just discussed, but with the exception of 2018 Q1 SG&A Explanation Statement, are that Skechers' SG&A expenses were planned and often contractually committed six to nine months in advance and that the expenses for Skechers' operations in China had been continuously increasing, primarily for operating mono-branded retail stores and satisfying online orders through third-party logistics partners. According to plaintiffs, given these aspects of Skechers' operations, its management should have known that the Company would not be able to achieve any leverage, which would render the challenged statements not only false, but also actionable.

The allegations in the CAC, however, speak to only half of the story: the other half is completely missing. The subject of challenged statements is "leverage": the ratio between respective growth rates of SG&A expenses and sales. Despite the reality that both Skechers' SG&A expenses and sales figures would affect leverage, the CAC is completely devoid of any allegation about Skechers' projections of its sales. To establish falsity of the challenged statements, plaintiffs must allege facts that, if assumed true, would undermine the genuineness of management's belief that the SG&A expenses would grow at a rate lower than the projected sales growth rate. Even if we were to assume that management was expecting the SG&A expenses to grow at a significant rate due to the Company's contractual commitments and operational structure in China, the challenged statements would not necessarily be false if management was simultaneously expecting its sales to grow at a higher rate. Not only have plaintiffs failed to allege any facts that discount this possibility about sales projections, but plaintiffs also ignore other portions of management's statements made during the earnings calls quoted in the CAC that are consistent with having highly optimistic sales growth projections. For example, in response to Morgan Stanley analyst's question during the earnings call for 2017 Q3, Weinberg stated that "we're about to pick up the pace in India, which is

starting to grow very, very well for us" and "Europe has picked up well, we're looking for more stores on the continent."[9]  CAC ¶ 114.

In short, plaintiffs have failed to adequately plead any actionable misstatement of material fact under the heightened pleading standard of Rule 9(b) and PSLRA.  Except for 2018 Q1 SG&A Explanation Statement, each of the challenged statements is either a non-actionable prediction or puffery.  As to 2018 Q1 SG&A Explanation Statement, plaintiffs have failed to plead facts sufficient to establish its falsity.

e) **Analysts' Reports**

Both in the CAC and during the oral argument, plaintiffs repeatedly referred to reports published by securities analysts discussing the earnings calls at issue as evidence in support of their case.  See, e.g., CAC ¶¶ 74, 85; see also Oral Arg. Tr. at 6-7, 19-20.  Despite plaintiffs' extensive quotation of analysts' reports, the significance of those reports with respect to plaintiffs' claims is not readily apparent from the CAC.[10]  During

---

[9]     Further, the allegations about expenses in China alone are insufficient to establish the falsity of the alleged misstatements.  As conceded by plaintiffs, Skechers has been operating across the world.  See, e.g., CAC ¶ 64 ("as Skechers has increased its global footprint").  However, the challenged statements address projections about the leverage for the entire Company that include its operations across the world and not limited to China. None of the challenged statements provide any separate prediction about the leverage as to the Company's Chinese operations.  Therefore, the CAC's lack of allegations about the percentage of the Company's operations in China in relation to its global operations is fatal to plaintiffs' pleading of the challenged statements' falsity.

[10]    In Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000), the Second Circuit suggested that a plaintiff may assert a securities fraud claim under Section 10(b) and Rule 10b-5 of the Exchange Act against corporate officials based on false and misleading information disseminated through analysts' reports

oral argument, plaintiffs' counsel argued that, because those reports reveal the securities analysts' perception of themselves being misled by the management's statements at issue, the reports are strong evidence of those statements constituting actionable misstatements.[11]

Another court in this District has already rejected the plaintiffs' theory in the context of an omission claim. In Plumbers and Steamfitters Local 137 Pension Fund v. Am. Express Co., No. 15 Civ. 5999 (PGG), 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017), the plaintiff, represented by the same counsel as plaintiffs here, sought to use poor predictions from a number of analysts to establish an omission of a material fact. In rejecting this theory, Judge Gardephe reasoned:

> [T]he Amended Complaint does not reveal how the analysts it cites were selected, how large a group they were selected from, or whether these analysts' poor predictions are representative of broader

by alleging that the officials either: "(1) intentionally fostered a mistaken belief concerning a material fact that was incorporated into reports; or (2) adopted or placed their 'imprimatur' on the reports." However, nowhere in the CAC and their motion papers do plaintiffs appear to even suggest that they intend to assert this type of claim. Even if were we to assume such an intent, plaintiffs' have failed to adequately plead such a claim. All of the analysts' reports quoted in the CAC simply parrot the alleged misstatements by defendants, which we have already concluded are non-actionable predictions without guarantees. See supra at 20-23. Accordingly, it would be challenging for plaintiffs to argue that the Individual Defendants intended to foster a mistaken belief about any material fact in analysts' mind through those statements. Moreover, plaintiffs do not allege in the CAC that the Individual Defendants endorsed or expressed any position as to those reports.

[11] The CAC also quotes some reports that are not directly related to any of the earnings calls at issue. See, e.g., CAC ¶¶ 85 (Buckingham Research Group report based on the meetings with defendants Weinberg and Vandemore that it hosted on March 12, 2018); 86 (Susquehanna Financial analysts report, providing a "preview" of Skechers 2018 Q1 results). These reports are irrelevant to this motion because they do not proffer any statement by defendants as required by PSLRA.

> financial analysis at the relevant time. Absent
> such information, it is impossible to determine
> whether the analysts who are cited are the few who
> were wrong, or whether their mistaken estimates are
> indicative of a broader market understanding.

Id. Judge Gardephe further suggested that securities analysts'

reactions would be irrelevant when the statements at issue are

clear on their face. Id. ("that a few analysts might have ignored

the context in which Amex's statements were made—and relied on

data from five years earlier—in attempting to estimate the

financial significance of the Costco U.S. relationship to Amex,

does not make Amex's statements misleading where the language and

import of Amex's statements are plain.").

The Court finds Judge Gardephe's reasoning equally applicable

to the theory advanced by plaintiffs here. It is not clear from

the CAC that the broader market perceived the alleged misstatements

as the quoted securities analysts did. Further, we have already

concluded that the alleged misstatements, when considered in

context, plainly did not amount to a guarantee or promise.[12] What

the analysts' reports at most can establish is that at least a

portion of the market was paying attention to the trend of

Skechers' SG&A expenses. To infer an actionable misstatement from

---

[12] We further note that the portions of analysts' reports emphasized by plaintiffs in the CAC generally discuss the analysts' own projections based on Skechers' management's statements. See, e.g., CAC ¶¶ 74 ("But now we anticipate the stock will break out as all three components of the P&L start to work in tandem."); 75 ("Management expects, and we agree, that SG&A will lever in 2018."); 79 ("We believe SKX has likely hit an inflection point and the SG&A leverage experienced in 4Q17 will continue for the foreseeable future (at least through FY18 and possibly into FY19)").

this proposition would be inconsistent with the established doctrine that pleading a securities fraud claim requires both the existence of an actionable misstatement or omission of a material fact and reliance on that misstatement or omission as discrete elements. <u>See</u> <u>supra</u> at 13. Therefore, we reject plaintiffs' effort to reverse-engineer a non-actionable statement into an actionable misstatement based on the securities analysts' interpretation or reaction.

### 4. <u>Alleged Omissions of Material Facts</u>

As discussed above, an omission is actionable under Section 10(b) and Rule 10b-5 if a defendant had a duty to disclose the allegedly omitted information, <u>Levitt v. J.P. Morgan Sec., Inc.</u>, 710 F.3d 454, 465 (2d Cir. 2013), and such duty to disclose "may arise when there is a corporate insider trading on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." <u>Stratte-McClure v. Morgan Stanley</u>, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks omitted). Nowhere in the CAC or their motion papers do plaintiffs suggest that omission claims they seek to assert are predicated on Skechers' insiders trading on confidential information.

However, in their opposition brief, plaintiffs argue that Skechers was required to disclose its future SG&A expenses to prevent defendant Weinberg's statement that the Company's SG&A

expense growth slowdown "will certainly continue" into 2018 Q1 during the earnings call for 2017 Q3 from becoming misleading. See Pls.' Opp'n (ECF No. 49) at 13. This argument fails for multiple reasons. First, we have already concluded that the statement cited by plaintiffs was a non-actionable projection of future performance. See supra at 22-23. Second, the CAC does not contain sufficient facts to show that, had Skechers disclosed all future expenses then known, Weinberg's statement would have provided a meaningfully different understanding to a reasonable investor. Tangue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016) (citing Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 U.S. 1318, 1332 (2015)). As discussed previously, the CAC only mentions advance commitment of expenses associated with opening new retail stores, and the timeline for that process is not described in any more detail than "six to nine months." Also, the CAC neither addresses expenses other than opening of new retail stores nor provides any information as to the percentage of those expenses in relation to the Company's total expenses. Under the circumstances, plaintiffs have failed to allege sufficient facts to establish that disclosure of allegedly omitted information would have altered the significance of the challenged statements to a reasonable investor. Therefore, plaintiffs have failed to adequately plead an omission claim predicated on the challenged statements.

36

Plaintiffs' omission claim predicated on Item 303 also fails. To state an omission claim predicated on Item 303, plaintiffs must plead that (1) defendant failed to comply with Item 303 in a SEC filing, and (2) the omitted information was material under Section 10(b) and Rule 10b-5. <u>Stratte-McClure</u>, 776 F.3d at 103. As discussed above, Item 303 requires disclosure of a trend or uncertainty that is "known" to the management. 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs allege that Skechers violated Item 303 by failing to disclose the upward trend of Skechers' SG&A expenses in its 10-Qs and 10-K filed during the Class Period. CAC ¶ 154. In advancing this contention, plaintiffs essentially argue that the management should have been aware of the Company's future expenses because new retail stores, and financial projections associated with them, are "planned at least six to nine months prior to [their actual] openings." CAC ¶¶ 7, 60. This argument fails for virtually the same reasons as do their omission claim predicated on the challenged statements. The CAC does not contain any facts that allow us to relate the alleged six-to-nine-month advance commitment of expenses to the Company's aggregate SG&A expenses at any specific point of time in the future. The CAC simply does not provide sufficient facts to infer Skechers'

capability to extract any meaningful trend in its global expenses for any specific period of time during the Class Period.[13]

     5.   <u>Pleading of Scienter as to Individual Defendants</u>

To summarize the discussion so far, plaintiffs have failed to adequately plead any actionable misstatement or omission of material facts to sustain their purported securities fraud claims. This conclusion is sufficient for resolving this motion. Nevertheless, for completeness, we will assume <u>arguendo</u> an adequate pleading of a misstatement or omission and then address whether plaintiffs have adequately pled scienter as plaintiffs' complaint relies heavily on not implausible assertions about defendants' knowledge of future expenses.

As previously discussed, plaintiffs can adequately plead scienter (1) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," or (2) "by alleging facts

---

[13]    Insofar as plaintiffs seek to assert an Item 303 omission claim predicated on the trend or uncertainty involving leverage—expense growth in relation to sales growth—they have failed to plead one. As discussed above in Section B.3.d), the CAC is devoid of any allegation about the Company's projections of future sales. Accordingly, no inference about management's knowledge of future leverage can be made. Moreover, even if we were to regard plaintiffs' purported claim as simply alleging a failure to disclose "ever-increasing SG&A expense growth," CAC ¶ 153, it still fails. The Court's review of Skechers 10-Qs and 10-K during the Class Period reveals that each of those filings contains financial statements that provide not only the expense figures for the applicable period but also those figures for the corresponding period of the prior fiscal year. <u>See, e.g.</u>, Skechers 10-Q for 2017 Q3 at 4, available at: https://www.sec.gov/Archives/edgar/data/1065837/000156459017021466/skx-10q_20170930.htm. Given those disclosures, any reasonable investor could have calculated the allegedly omitted trend of ever-increasing SG&A expense growth. It is particularly noteworthy that those figures appear in the same regulatory filings that contain some of the challenged statements. Plaintiffs cannot simply ignore the more specific items disclosed in regulatory filings while seeking to assert securities fraud claims based on the more general statements in the same filings.

that constitute strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 553 F.3d at 198. Plaintiffs argue that they have adequately pled scienter as to the Individual Defendants by proffering allegations about: (1) the Individual Defendants' sale of Skechers' stock during the Class Period; (2) their incentive-based compensation structure; and (3) their access to and knowledge of information contradicting the alleged misstatements. The Court addresses each alleged basis of scienter in turn and considers these bases collectively as well.

a) **Stock Sales**

According to plaintiffs, the Individual Defendants' sales of Skechers stock during the Class Period provide a basis to infer that they had substantial motives for not disclosing the continued increase of Skechers' future SG&A expenses.

"Motive can be shown when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018). However, "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter." In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d 323, 344 (S.D.N.Y. 2008). Rather, plaintiffs must establish that the sales at issue were "unusual" or suspicious. See, e.g., Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995); In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y.

June 1, 1998) ("Unusual insider trading activity during the class period may permit an inference of scienter; however, plaintiffs bear the burden of showing that any such sales are in fact unusual."). Whether the trading activities at issue were "unusual" or "suspicious" turns on a number of factors: (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans. Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

Plaintiffs allege that trading activities by defendants Greenberg and Weinberg were unusual and suspicious. CAC ¶ 162. The alleged transactions by those defendants are (1) defendant Weinberg's sale of 23,183 and 25,210 shares on March 2, and May 2, 2018, respectively; (2) defendant Greenberg's sale of 37,814 shares on March 2, 2018; and (3) defendant Greenberg's sale of 500,000 shares between December 19 and 20, 2017. Id. at ¶¶ 161-68. These transactions yielded total proceeds of approximately $22 million. Id. Upon consideration of all relevant facts, the Court concludes that these sales were not unusual or suspicious.

We address defendant Weinberg's trading activities first. The CAC alleges only two transactions by defendant Weinberg: sale of 23,183 shares on March 2, 2018, and another sale of 25,210 shares on May 2, 2018. CAC ¶ 161. These sales yielded over $1.6 million in total proceeds. Id. at ¶ 165. However, the CAC does not include any allegation about the profit defendant Weinberg earned through these sales. Moreover, the number of shares defendant Weinberg disposed through these sales represented only 4.9% and 5.9% of then his current holdings of Skechers shares, percentages well-below the numbers that have been held by other courts as not unusual or suspicious.[14] See, e.g., Acito, 47 F.3d at 54 (selling 11% of defendant's holdings not unusual); In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (selling 22.5% and 4.9% of defendants' holdings not unusual); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) (selling 17.4% of defendants' holding, inclusive of shares and exercisable option, not unusual).

Plaintiffs seek to counter these facts by pointing to the timing of sales by defendant Weinberg, namely, that March 2, 2018 was the day after defendant Weinberg signed Skechers' 10-K for the

---

[14] The Court has drawn from the SEC's website the information of Skechers insiders' shareholding at various points of time. See In re Sina Corp. Sec. Litig., No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *11 (S.D.N.Y. Sept. 26, 2006) ("[T]he Court is entitled to take judicial notice of [the Company's] filings with the SEC, enabling us to conclusively determine that the Individual Defendants' trading activity during the Class Period was not at all unusual when compared with their prior activity.").

fiscal year 2017 and that May 2, 2018 was less than two weeks after an alleged misstatement on the Company's SG&A expenses was made during the Earnings Call for 2018 Q1. Id. at ¶¶ 166-67. The timing of those sales alone, however, is insufficient to generate a strong inference of scienter. Although the March 2, 2018 sale took place the day after Weinberg signed the Company's 10-K for 2017 that contained one of the challenged statements, that sale represented less than 5% of the defendant Weinberg's total holdings at the time including his indirect holdings through the David Weinberg Trust, of which defendant Weinberg was the sole beneficiary. Moreover, the sale preceded the alleged first corrective disclosure by at least a month and half. The May 2, 2018 sale also represented only approximately 6.2% of the defendant Weinberg's aggregate holding at the time and preceded the second corrective disclosure by more than two months. Upon consideration of all relevant circumstances, the Court concludes that the allegations involving defendant Weinberg's stock sales do not support an inference that those sales were unusual or suspicious.

We now evaluate stock sales by defendant Greenberg, addressing first his March 2, 2018 sale. Although plaintiffs allege that defendant Greenberg obtained "more than $1.5 million" in proceeds by selling 37,814 shares of Skechers common stock on March 2, 2018, the day after he signed Skechers 10-K for the fiscal year 2017, the CAC again contains no allegation about how much

profit defendant Greenberg earned through this sale. Moreover, this sale constituted 5.4% of his total holding of Skechers common stock at the time, an amount well below the amounts that courts generally find unusual. See supra at 41.

We next address Greenberg's sale of 500,000 shares of Skechers common stock between December 19 and 20, 2017, CAC ¶ 161. We acknowledge that the number of shares sold, which amounted to 65% of Greenberg's total holdings at the time, is sufficiently large to merit close scrutiny. However, a close inspection of all other relevant circumstances dispels concern. As we have noted in the context of other alleged stock sales, the CAC is completely devoid of any allegation about the profits defendant Greenberg obtained through this alleged sale; rather, plaintiffs only recite the amount of proceeds Greenberg obtained, which by itself says "nothing about [his] motive." See Glaser, 772 F. Supp. 2d at 592. Also, Greenberg's sale of 500,000 shares took place around the temporal midpoint between November 3, 2017—the date Skechers 10-Q for 2017 Q3, which contained an alleged misstatement, was filed—and February 8, 2018—the date the Earnings Calls for 2017 Q4, during which some of the alleged misstatements were made. This sale also preceded the alleged first corrective disclosure by approximately five months, see In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (concluding that lapse of "approximately four months between these substantial

sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in [plaintiffs'] favor"), and preceded the end of Class Period by more than seventh months. See City of Brockton Retirement Sys. v. Shaw Grp. Inc., 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("[the individual defendant] did not sell his stock at the end of the putative class period, when insiders would have rushed to cash out before the financial statements were restated.") (internal quotation marks omitted). Moreover, Greenberg engaged in similar trading well prior to this sale: between May 13 and 16, 2016, Greenberg disposed all shares of Skechers stock—300,000 shares—that he indirectly owned through Greenberg Family Trust, which amounted to 51.9% of his aggregate holding at the time. See SEC Form 4 by Robert Greenberg, dated May 17, 2016, available at: https://www.sec.gov/Archives/edgar/data/1065837/0001209191161206 94/xslF345X03/doc4.xml. Although Greenberg's sale between December 19 and 20, 2017 amounted to 65.1% of his holding at the time, once again Greenberg disposed of all shares of Skechers Stock that he indirectly owned through Greenberg Family Trust. See SEC Form 4 by Robert Greenberg, dated December 21, 2017, available at: https://www.sec.gov/Archives/edgar/data/1065837/0001209191170667 66/xslF345X03/doc4.xml. Furthermore, Greenberg still owned 666,583 shares of Skechers common stock when the alleged first corrective disclosure was made on April 19, 2018, and 654,681

shares when the alleged second corrective disclosure was made on
July 19, 2018.  Given all these facts, defendant Greenberg's sale
between December 19 and 20, 2017 was are not sufficiently unusual
or suspicious to allow a strong inference of scienter.  See In re
Health Mgmt., 1998 WL 283286, at *6 n.3 (concluding that sales by
the individual defendants, including the sale by one of them that
amounted to 81.9% of his then holding, were not suspicious when
viewed in light of other relevant factors).[15]

b) **Incentive-Based Compensation**

Plaintiffs also argue that the structure of Individual
Defendants' incentive-based compensation constituted a motive for
committing the alleged fraud.  Plaintiffs allege that Individual
Defendants' incentive-based compensation was calculated on a
quarterly basis by "multiplying net sales growth, which is the
amount by which net sales for the applicable quarter exceeded net
sales for the corresponding quarter in the prior year, by the
percentages that were pre-approved by the Compensation Committee."
CAC ¶ 170.  Under this incentive-based compensation structure,
defendant Greenberg would receive 0.5% and defendant Weinberg
would receive 0.15% of net sales growth as cash bonuses.  Id. at

---

[15]     Plaintiffs' endeavor to plead scienter based on the Individual
Defendants' stock sales fails in any event.  Given that Weinberg's trading
activities are not even remotely suspicious, Greenberg is the only Skechers
insider with potentially problematic trading activities.  However, "a
significant stock sale by just one corporate insider is insufficient to support"
an inference of scienter.  Frankfurt-Tr. Inv. Luxemburg AG v. United Tech.
Corp., 336 F. Supp. 3d 196, 218 (S.D.N.Y. 2018).

¶ 171.  The rate for defendant Weinberg was subsequently increased to 0.165% for the fiscal year 2018.  Id. at ¶ 172.  According to plaintiffs, this incentive-based compensation structure motivated defendants Greenberg and Weinberg to focus on growing sales, which inevitably led the SG&A expenses to grow.  Pls.' Opp'n at 23-24.  However, plaintiffs have failed to explain how a motive to achieve greater sales can evolve into a motive to make the alleged misstatements about the trend of the Company's SG&A expenses.[16]  Even assuming that the former somehow generates the latter, the Court concludes that plaintiffs' allegations about the structure of Individual Defendants' incentive-based compensation are insufficient to plead scienter.

Wholly apart from the flawed logic of plaintiffs' argument, it must be evaluated in the context of the Second Circuit's case law, which clearly provides that an incentive-based compensation system is generally insufficient to support a strong inference of scienter.  See, e.g., Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers.").  In an effort to avoid this case law, plaintiffs cite

---

[16]     Broadly speaking, the proposition plaintiffs appear to advance is of dubious validity.  The doctrine of economies of scale supports the conclusion that defendants could have plausibly expected to decelerate the growth of expenses by achieving greater sales.

*In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003).  However, *Vivendi* is readily distinguishable.  In *Vivendi*, the court concluded that the plaintiffs adequately pled scienter by alleging two "concrete benefits": (1) the artificially inflated stock price allowed the defendant Company to keep pursuing its acquisition of other companies, and (2) the Company's CEO received a bonus that was about two and half times of his normal salary for boosting the Company's EBITDA by more than 30% during a fiscal year.  *Id.*  The fraud alleged here has no bearing on what Skechers as a company could achieve.  Moreover, the Individual Defendants' incentive-based cash bonuses alleged here did not amount to an extraordinary opportunity to reap financial benefits as it was the case in *Vivendi*.  The Company's April 12, 2018 Proxy Statement— which plaintiffs refer to in Paragraph 171 of the CAC—indicates that, during the fiscal year 2017, defendant Greenberg received $4,230,769 in the base salary and $3,004,252 in the incentive-based cash bonus, and defendant Weinberg received $2,480,769 in the base salary and $901,277 in the incentive-based cash bonus. The level of ratio between incentive-based bonus to base salary that was present in *Vivendi* is not present here.[17]

---

[17]    Plaintiffs also cite *In re Nevsun Resources Ltd.*, No. 12 Civ. 1845 (PGG), 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013) in their brief. Although the court in *Nevsun* mentioned the plaintiffs' allegations about cash bonuses that the individual defendants received as a result of the alleged fraud, it did not address whether those allegations were sufficient to plead scienter.  Rather, the court addressed the adequacy of scienter pleading only with respect to the allegations about the individual defendants' stock sales and what the company could achieve because of the inflated stock price.  *Id.*

In short, plaintiffs have pled "no facts that would remove [Skechers'] compensation plan from [the] general rule" that a performance-based compensation as evidence of motive is insufficient to support a strong inference of scienter. In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). Additionally, in reaching this conclusion, we note that there was nothing particular about the Class Period that would have motivated the Individual Defendants to commit the alleged fraud: Skechers' SEC filings indicate that the alleged incentive-based compensation structure has been in place since the fiscal year 2012,[18] and nothing in the CAC or the Company's SEC filings suggests that the alleged incentive-based compensation structure was set to expire in the near future. See ECA, 553 F.3d at 201 ("In Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 661-62 (8th Cir. 2001), the plaintiffs made a showing of a direct link between the compensation package and the fraudulent statements because of the magnitude of the compensation and the defendants' motive to sweep problems under the rug given one defendant's expiring contract."(emphasis added)).

---

[18] In their motion papers, defendants claim that an incentive-based compensation system based on the net sales growth has been in place since 2006. Defs.' Mem. of Law (ECF No. 46) at 20. However, Skechers' SEC filings reflect that the incentive-based compensation system between the fiscal years 2006 and 2011 provided not only a bonus as a percentage of net sales growth but also a lump-sum amount of cash for achieving a positive EBITDA. For the period between 2006 and 2011, the incentive-based compensation would have been favorably impacted by controlling expenses through the direct effect on EBITDA. Thus, defendants' reliance on the incentive-based compensation system that was in place during that period is misplaced.

### c) **Recklessness**

Plaintiffs alternatively argue that they have alleged facts constituting strong circumstantial evidence of conscious misbehavior or recklessness by defendants. As discussed above, the Second Circuit has described at least four circumstances that may give rise to a strong inference of scienter. See ECA, 553 F.3d at 198-99. Of the four, plaintiffs do not allege that defendants either engaged in any illegal behavior or failed to check information they had a duty to monitor. Nor do plaintiffs make any allegation about the concrete and personal benefit defendants acquired through the alleged fraud other than the alleged financial gains arising from sales of Skechers stock during the Class Period and receiving incentive-based compensation, which we have already found insufficient to plead scienter. Therefore, the plaintiffs' recklessness argument to establish scienter comes down to whether plaintiffs have alleged sufficient facts to support an inference that the Individual Defendants "knew facts or had access to information suggesting that their public statements were not accurate." Id.

In the CAC, plaintiffs allege that the Individual Defendants should have been aware that the Company's SG&A expenses would grow, and this information should have apprised them of the allegedly false and misleading nature of the now unsuccessfully challenged statements. CAC ¶¶ 158-59. As the basis of the Individual

Defendants' knowledge of that information, plaintiffs rely on their "high-level positions within the Company." Id. at ¶¶ 157-58. However, "[s]cienter cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information." Foley v. Transocean Ltd., 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012). Instead, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). Although their high-level positions should presumably have provided the Individual Defendants access to the Company's internal expense forecasts, the issue is whether there really were clearly contrary predictions. The CAC simply does not contain any support for existence of contrary predictions. The mere inconsistency between the challenged statements and after-the-fact results of Skechers' operations amounts nothing more than a claim of "fraud by hindsight," which the Second Circuit has held insufficient to plead scienter. Id.

In their brief, plaintiffs endeavor to overcome the general principle that high-level positions are insufficient to plead scienter by arguing that the underlying subject of the alleged fraud—SG&A expenses—is so fundamental to the Company's operations that the Individual Defendants' knowledge about it should

virtually by presumed.  This position is consistent with <u>In re GE</u> <u>Sec. Litig.</u>, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012), which plaintiffs cite in their motion papers.  This theory, often called as the "core operations" doctrine, provides that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operation of the company supports the inference that the defendant knew or should have known the statements were false when made."  <u>In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.</u>, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); <u>see</u> <u>generally</u> <u>Cosmas v.</u> <u>Hassett</u>, 886 F.2d 8, 13 (2d Cir. 1989).  The Second Circuit has not decided whether the "core operations" doctrine remains valid as a theory of scienter following the PSLRA.  <u>See</u> <u>Frederick v.</u> <u>Mechel OAO</u>, 475 F.App'x 353, 356 (2d Cir. 2012).  Regardless of its current viability, the doctrine contributes little to the scienter analysis here.  For one, the majority rule is to "consider the 'core operations' allegations to constitute supplementary, but not an independent, means to plead scienter."  <u>Schwab v. E*TRADE</u> <u>Fin. Corp.</u>, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (Koeltl J.) (internal quotation marks omitted); <u>see also</u>, <u>Holbrook v. Trivago</u> <u>N.V.</u>, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26, 2019), <u>aff'd sub nom.</u> <u>Shetty v. Trivago N.V.</u>, No. 19-0766, 2019 WL 6834250 (2d Cir. Dec. 16, 2019).  In the utter absence of any other evidence of fraudulent intent, the doctrine

itself is insufficient to give rise to the necessary inference. Therefore, the allegations that the SG&A expenses are a fundamental component of the Company's operations fail to cure the defect in the plaintiffs' pleading of scienter as to the Individual Defendants, and therefore, the "core operations" doctrine is no avail. See Wyche v. Advanced Drainage Sys., Inc., No. 15 Civ. 5955 (KPF), 2017 WL 971805, at *14 (S.D.N.Y. Mar. 10, 2017) (concluding that the allegations of "executives [having] access to inventory reports" through the internal system at all times and being "responsible for establishing and maintaining disclosure controls and procedures" for the company were insufficient to plead scienter for a securities fraud claim predicated on alleged misstatements in its financial statements about the company's accounting of inventory).

### d) All Three Alleged Bases Considered Collectively

The Court concludes that plaintiffs have failed to adequately plead scienter as to the Individual Defendants even when the allegations discussed above are considered together. Each category only minimally, if in any degree, supports an inference of scienter. Given the absence of an interplay among those categories that generates some significance that each category has failed to generate individually, the Court concludes that those

allegations as a package still fail to support any compelling inference of scienter as to the Individual Defendants.

### 6. Pleading of Scienter as to Corporate Defendant

Failure to adequately plead scienter as to the Individual Defendants is not dispositive of the pleading of scienter as to defendant Skechers. Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 196 (2d Cir. 2008). "Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter[,] or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted).

Plaintiffs cannot satisfy their burden under either prong. As to the first prong, we have already concluded that plaintiffs have failed to adequately plead scienter as to any of the Individual Defendants. Accordingly, plaintiffs cannot plead the corporate scienter by imputing an individual's scienter to the Company. As to the second prong, we have concluded that plaintiffs have not alleged sufficient facts showing that anyone in Skechers

53

had knowledge about its future SG&A expenses for any specific point of time in any level of specificity.

Regarding the corporate scienter of Skechers, plaintiffs make only conclusory allegations that its "officers, management, and agents . . . had actual knowledge of misrepresentations and omissions of material facts," or "acted with reckless disregard for the truth [by failing] to ascertain and to disclose such facts, even though such facts were available to them." CAC ¶ 178. These allegations, however, have already been held by the Second Circuit as insufficient to adequately plead the corporate defendant's scienter in <u>Teamster Local 445</u>. In particular, the Second Circuit held that the allegation of access to data that would reveal the alleged contrary facts without "specifically identify[ing] the reports or statements containing [such] information" is insufficient to plead corporate scienter. <u>Teamster Local 445</u>, 531 F.3d at 196. As discussed above in the context of the Individual Defendants, plaintiffs have not identified in the CAC any report or statement in Skechers' possession that contained information about projections of Skechers' SG&A expenses. Moreover, the CAC provides no measure to relate projected or committed expenses to the Company's global expenses at any specific point of time in the future. The lack of such information forecloses a finding that any official of Skechers was "sufficiently knowledgeable" with respect to falsity of the challenged statements. Therefore, the

Court concludes that plaintiffs have failed to adequately plead scienter as to the corporate defendant Skechers as well.[19]

### III.   Conclusion

For the foregoing reasons, the Court concludes that plaintiffs have failed to state any claim under Section 10(b) of the Exchange Act and Rule 10b-5. As a corollary of the plaintiffs' failure to plead a claim under Section 10(b), their purported claim under Section 20(a) of the Exchange Act also fails. Therefore, the Court grants defendants' motion to dismiss the CAC. The Clerk of Court is respectfully directed to enter a judgment in that effect and close the case. This Memorandum and Order resolves ECF Docket Entry No. 45.

**SO ORDERED.**

Dated:    New York, New York
          March 12, 2020

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[19]    At the very end of their memorandum of law, plaintiffs include a footnote request for leave to amend without even suggesting how a fourth complaint would cure the many deficiencies in the CAC. Rather, plaintiffs appear to argue that they are entitled to an advisory opinion from the Court so that they can learn how the CAC should be amended yet again. Apart from the highly questionable nature of this proposition, it is particularly inapt here. Not only is the currently operative complaint a consolidated amended complaint (i.e., the product of two separate complaints), but a pre-motion letter exchange preceded the briefing on the motion to dismiss, and the briefing on the motion was followed by full oral argument. At no time have plaintiffs proffered the content of any proposed amendment or given any "clue as to how the complaint's defects would be cured." Loreley Fin., 797 F.3d at 190. For all these reasons, the perfunctory request for leave to amend is denied.